## In re BAKER & EDWARDS.

(District Court, E. D. North Carolina. July 3, 1915.)

1. BANKRUPTCY ☞320—CLAIMS OF SURETIES FOR BANKRUPT.

Bankr. Act July 1, 1898, c. 541, § 63b, 30 Stat. 562 (Comp. St. 1913, § 9647), provides that unliquidated claims may, on application to the court, be liquidated as it shall direct and may be proved and allowed. General Order XXI, subd. 4 (89 Fed. x, 32 C. C. A. xxiii), provides that claims of persons contingently liable for the bankrupt may be proved in the name of the creditor, when known, but that no dividend shall be paid thereon, except upon proof that it will diminish pro tanto the original debt. Claimant guaranteed the rent of $50 a month under a lease to a partnership, which had 3½ years still to run when bankruptcy intervened. Arbitrators appointed by the referee reported that the rental value was $33⅓ a month. The lessors were not parties to the arbitration, and it did not appear whether they had elected to declare the term forfeited for failure to pay rent, to hold claimant for the full rent, or to take the property at the rental value fixed by the arbitrators. *Held*, that claimant's claim for the difference between the rent reserved and such rental value could not be allowed, but that she might prove the claim for the amount of which she was contingently liable in the name of the lessors, and the dividend thereon should be paid to the lessors in exoneration pro tanto of her liability.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 479, 480; Dec. Dig. ☞320.]

2. BANKRUPTCY ☞309—CLAIMS PROVABLE—PARTNERSHIP AND INDIVIDUAL ASSETS.

E.'s wife loaned him $2,000, and he loaned B. $500 thereof; each putting the borrowed money into the business of a partnership organized by them. E. transferred to his wife B.'s note for the borrowed money. On September 9, 1914, the goods and accounts of the firm inventoried $11,550, and the indebtedness, exclusive of that due E.'s wife, was $6,000. On that day E. sold his interest to his wife, and on September 24th she sold such interest to B., taking his notes for $1,500 in payment. On January 29, 1915, B. filed a petition in bankruptcy. *Held*, that the debts due E.'s wife were provable and entitled to share in the assets, consisting of the stock in trade and open accounts, as B. had prior to the bankruptcy become the sole owner of the property formerly belonging to the partnership, and there were no partnership assets entitling the partnership creditors to priority, and E.'s sale to his wife was supported by a consideration, consisting of his indebtedness to her, and was apparently in good faith.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 555–564; Dec. Dig. ☞309.]

3. BANKRUPTCY ☞44—VOLUNTARY PROCEEDINGS—PARTIES—PARTNERSHIPS.

B., a member of a firm composed of himself and E., purchased E.'s interest and continued the business in the firm name. He subsequently filed a petition in bankruptcy, which he signed "B. & E., by B." *Held*, that the proceedings should be regarded as having been instituted by B., doing business as B. & E.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 43–46; Dec. Dig. ☞44.]

In Bankruptcy. In the matter of Baker & Edwards, bankrupts. On petition for review of an order of the referee. Order affirmed in part, and modified in part.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

John L. Bridgers, W. O. Howard, and G. M. T. Fountain, all of Tarboro, N. C., for trustee.

H. A. Gilliam, of Tarboro, N. C., for Mrs. Selma K. Edwards.

CONNOR, District Judge. The referee certifies, upon the petition for review of W. O. Howard, trustee, the following facts:

Prior to September 9, 1914, W. C. Baker and L. E. Edwards, as copartners under the firm name and style of Baker & Edwards, conducted in Tarboro, N. C., a mercantile business. On September 9, 1914, L. E. Edwards, for a valuable consideration, assigned and transferred his interest in said firm and its property to Selma K. Edwards, who, on September 24, 1914, transferred the interest which she acquired from her husband to W. C. Baker. At the date of said assignment the indebtedness outstanding against the firm amounted to about $6,000. The stock on hand inventoried $10,300, and the accounts due it $1,350. After purchasing the interest of Selma K. Edwards, W. C. Baker caused to be inserted in the Tarboro Southerner, a newspaper published in the town of Tarboro, N. C., an advertisement stating that he had purchased the interest of his partner in the firm of Baker & Edwards, and that the business would be conducted along the same lines "as heretofore"; that:

"Baker & Edwards wish to thank the people of Tarboro for their liberal patronage in the past and ask for a continuance to the new firm.

"W. C. Baker, 'The Dependable Store.'"

W. C. Baker also gave personal notice of the purchase and dissolution of the firm to several persons with whom the firm had dealt, and to mercantile agencies in Norfolk, Baltimore, and Philadelphia, the residence of a number of persons with whom the firm dealt and to whom it was indebted. Subsequent to September 24, 1914, Baker contracted accounts for goods purchased, due and unpaid, amounting to $1,620.55. The goods purchased by him subsequent to September 24, 1914, were commingled with those on hand at that date. On January 29, 1915, W. C. Baker filed a voluntary petition in bankruptcy and was duly adjudged bankrupt. The petition is filed in the name of, and signed, "Baker & Edwards, by W. C. Baker." The schedule of debts includes the accounts due by Baker & Edwards, prior to September 24, 1914, and those contracted subsequent thereto. The debts hereinafter described, due Mrs. Selma K. Edwards, are also scheduled. The assets, at that time, consist of the stock in trade, inventoried at $7,000, and open accounts, $1,200. W. O. Howard was duly elected trustee, and sold the entire stock of goods for $2,779.61. He has collected about $36 on the accounts and received $64.50 cash on hand. Mrs. Selma K. Edwards filed proof of the following debts:

(1) On August 1, 1913, Baker & Edwards leased from Dr. J. M. Baker and wife a storehouse in the town of Tarboro, N. C., for the term of 5 years at a rental of $50 per month. Mrs. Selma K. Edwards, by a paper writing duly executed, guaranteed the payment of the rent during the entire term. The storehouse was leased for the purpose of conducting the mercantile business of said firm. At the date of the adjudication in bankruptcy, the unexpired term of the lease

was 3 years and 6 months. Both the partners are insolvent. For the purpose of ascertaining the value of the lease during the unexpired portion of the term, arbitrators were appointed by the referee, who reported that the rental value of the property for the remainder of the term was $33.33⅓ a month. Selma K. Edwards was therefore liable for $16.66⅔ a month, amounting, during the unexpired portion of the term, to $700, for which amount she was permitted by the referee to prove a claim.

(2) Mrs. Selma K. Edwards loaned to her husband, September 1, 1913, the sum of $500, which sum he loaned to W. C. Baker, taking his five notes, of $100 each, payable January 1, 1915, September 1, 1915, September 1, 1916, September 1, 1917, and September 1, 1918, carrying interest from date. The money thus borrowed by W. C. Baker was used by him in paying his portion of the capital upon which the firm of Baker & Edwards began business. L. E. Edwards indorsed these notes to his wife, Selma K. Edwards, for value, and they are now, and were at the date of the adjudication of said firm, her property. She offered to prove this debt and share in the distribution of the assets in the hands of the trustee.

(3) On September 28, 1914, W. C. Baker executed to Mrs. Selma K. Edwards three promissory notes, for $500 each, payable January 1, 1915, January 1, 1916, and January 1, 1917, with interest from date. These notes were given for the purchase price of the interest of Mrs. Edwards in the firm of Baker & Edwards, as heretofore set forth. She offered to prove them as a debt against and share in the distribution of the assets in the hands of the trustee. The referee allowed each and every of the said claims to be proven as claims against and entitled to share in the distribution of the funds in the hands of the trustee. The trustee duly objected, and filed his petition for review.

[1] The right to file the proof of claim, arising out of her obligation, accruing on account of the lease made by the bankrupt from Dr. J. M. Baker and wife, is dependent upon the provisions of section 63b and General Order XXI, subd. 4 (89 Fed. x, 32 C. C. A. xxiii). The claim of Dr. Baker, for the purpose of making proof herein, for the rent as it accrues, is fixed; but the amount which he may collect from Mrs. Edwards is contingent. It would seem that, upon the adjudication of the lessees, the lease interest of the bankrupts should have been sold by the trustee; but, as from the report of the arbitrators appointed by the court, it had no value, the rent reserved being in excess of the rental value, no benefit would have accrued to the estate. Mrs. Edwards, as guarantor of the rent, may, if she had seen fit, have taken possession of, and either used or sublet, the property, for her indemnification. Dr. Baker was entitled to declare the term forfeited, upon the failure to pay the rent as provided in the lease. This right is expressly reserved. It does not appear that he has exercised it. If he does not see fit to do so, he may call upon Mrs. Selma K. Edwards at the end of the month, or at the end of the term, for the rent. Her obligation binds her to pay—

"the monthly rental of $50 for the entire period of 5 years, or so much thereof as shall remain unpaid by Walter Baker and L. E. Edwards on the day appointed for such payments in the contract of lease."

It does not appear from the referee's finding what course Dr. Baker has elected to pursue. It is impossible to ascertain what is the extent or the probable amount of Mrs. Selma K. Edward's liability. Dr. Baker and his wife are not parties to, nor are they bound by, the arbitration. If they should elect to take the property for the unexpired term at the rental value fixed by the arbitrators, there would be a deficit of $16.66⅔ per month for that period for which Mrs. Edwards would be liable. Until she pays this amount, she has no provable debt against the estate of Baker. She would, however, be entitled, under the terms of General Order XXI, subd. 4, to prove in the name of the creditor for the amount for which she is contingently liable, and the share which the amount proven receives from the trustee should be paid to Dr. and Mrs. Baker in exoneration pro tanto of her liability.

In Williams v. U. S. Fidelity & Guaranty Co., 236 U. S. 549, 35 Sup. Ct. 289, 59 L. Ed. 549, it was held that, as the surety was permitted, by pursuing the course prescribed by General Order XXI, subd. 4, to prove the debt for which he was liable and share in the distribution of the assets of the principal, bankrupt, his claim against such bankrupt was discharged. Mr. Justice McReynolds says:

"Within the intendment of the law provable debts include all liabilities of the bankrupt founded on contract, express or implied, which at the time of the bankruptcy were fixed in amount, or susceptible of liquidation. * * * It provides complete protection and ample remedy in behalf of the surety upon such obligation. He may pay it off and be subrogated to the rights of the creditor; if the creditor fails to present the claim for allowance against the estate, he may prove it; and in any event he has abundant power by resort to the court or otherwise to require application of its full pro rata part of the bankrupt estate to the principal debt. To the extent of such distribution, the obligation of the bankrupt to the surety will be satisfied."

While it may be that, in the practical working out of the situation, Mrs. Edwards may be fixed with a different amount than that fixed by the arbitrators, that cannot be avoided. Whatever amount she may be called upon to pay will be reduced by the amount which Dr. Baker receives from the trustee. The proof of debt is not in the form contemplated by General Order No. XXI, subd. 4. It may be so amended that the dividend will be paid Dr. and Mrs. Baker. The ruling of the referee, as modified, is affirmed.

[2] In regard to the other claims, a number of interesting questions, not free from difficulty, are presented, upon the facts certified by the referee and the contention of counsel. While certain general principles, relating to the rights and obligations of copartners inter sese and to the creditors of the partnership, are well settled, the courts have found difficulty in the administration of the property of insolvent partnerships. It may be regarded as settled that, while each partner is entitled, in exoneration of his individual liability, to demand that the partnership property be applied to the discharge of partnership debts, before any portion is applied to the debts of the individual partners, the partnership creditors have no lien upon the partnership property. Mr. Justice Strong, in Case v. Beauregard, 99 U. S. 119, 25 L. Ed. 370, says:

"No doubt the effects of a partnership belong to it so long as it continues in existence, and not to the individuals who compose it. The right of each partner extends only to a share of what may remain after payment of the debts * * * and the settlement of its accounts. Growing out of this right, or rather included in it, is the right to have the partnership property applied to the payment of the partnership debts in preference to those of any individual partner. This is an equity the partners have as between themselves, and in certain circumstances it inures to the benefit of the creditors of the firm. The latter are said to have a privilege or preference, sometimes loosely denominated a lien, to have the debts due to them paid out of the assets of a firm in course of liquidation, to the exclusion of the creditors of its several members. Their equity, however, is a derivative one. * * * It is practically a subrogation to the equity of the individual partner, to be made effective only through him. Hence, if he is not in a condition to enforce it, the creditors of the firm cannot be. * * * But so long as the equity of the partner remains in him, so long as he retains an interest in the firm assets as a partner, a court of equity will allow the creditors of the firm to avail themselves of his equity, and enforce, through it, the application of those assets primarily to payment of the debts due them, whenever the property comes under its administration. * * * So, if before the interposition of the court is asked the property has ceased to belong to the partnership if by a bona fide transfer it has become the several property either of one partner or of a third person, the equities of the partners are extinguished, and consequently the derivative equities of the creditors are at an end. It is, therefore, always essential to any preferential right of the creditors that there shall be property owned by the partnership when the claim for preference is sought to be enforced. Thus, in Ex parte Ruffin, 6 Ves. 119, where from a partnership of two persons one retired, assigning the partnership property to the other, and taking a bond for the value and a covenant of indemnity against debts, it was ruled by Lord Eldon that the joint creditors had no equity attaching upon partnership effects, even remaining in specie. * * * The joint estate is converted into the separate estate * * * by force of the contract of assignment. And it makes no difference whether the retiring partner sells to the other partner or to a third person, or whether the sale is made by him or under a judgment against him. In either case his equity is gone."

The learned justice says:

"These principles are settled by very abundant authorities."

Applying the principles to the instant case, where transfers of the individual partners in the partnership property were made before the bill was filed, it is said:

"The effect of these transfers and act of fusion was very clearly to convert the partnership property held in severalty, or, at least, to terminate the equity of any partner to require the application thereof to the payment of the joint debts. Hence if, as we have seen, the equity of the partnership creditors can be worked out only through the equity of the partners, there was no such equity of the partners, or any one of them, as is now claimed, in 1869, when this bill was filed. No one of the partners could then insist that the property should be applied first to the satisfaction of the joint debts, for his interest in the partnership and its assets had ceased."

In Allen v. Center Valley Co., 21 Conn. 130, 54 Am. Dec. 333, Church, C. J., quotes with approval from Bissett on Partnership:

"That, notwithstanding the rights of the joint creditors, the partners may convert the joint property into separate property; for, having no lien on the property, the joint creditors, when notice of dissolution is given, cannot prevent the partners from effectually transferring it, by bona fide alienation. * * * The partners may, during the partnership, convert joint into separate property, or separate into joint, and the property will, at the dissolution, be held to possess that character which is then impressed upon it."

In Howe v. Lawrence, 9 Cush. (Mass.) 553, 57 Am. Dec. 68, Mr. Justice Bigelow says:

"The right of copartners upon dissolution to transfer the joint property to one of the firm is clear and unquestionable. The effect of such transfer as between the partners is to vest the legal title to the property in the individual partner, with the right to use and dispose of it as his separate estate. It would seem to follow as a necessary consequence that the creditors of the firm, after such conveyance, would have no right to look to the property transferred as joint property, upon which they had any special claim or lien. If in such transfer there is no fraud and collusion between the copartners for the purpose of defeating the rights of the joint creditors, and the transaction is made in good faith, upon dissolution, and for the purpose of closing the affairs of the partnership, the joint property thereby becomes separate estate, with all the rights and incidents both in law and equity which properly attach thereto. The mere fact of the transfer of the property does not in any way affect the rights of the joint creditors. During the continuance of the partnership, and before the institution of proceedings in insolvency, the creditors of the firm have no specific claim or lien, and, strictly speaking, no equity as against the effects of the partnership. They can only institute actions at law * * * against the firm on which they can take the partnership property, or the separate estate of each partner, or both, for the purpose of satisfying the executions, which they may obtain upon their judgments against the firm. The joint property, after its transfer to one of the copartners, is equally within the reach of legal process by the creditors of the firm as if it had remained the property of the partnership. Beyond this right to seize the joint property on legal process, the creditors of the firm * * * have no control over the partnership effects, and no right, either in law or equity, to restrain the disposition of them. The partners have the power to transfer them for a valuable consideration to each other or to strangers. The only limitation on this power is that it shall be exercised bona fide, and without any intent to defraud the creditors of the firm, or to deprive them of their legal or equitable claims upon the joint estate in case of insolvency. * * * If the transfer has been made honestly and for a valuable consideration, the property has thereby become separate estate, wholly free from any claims of the joint creditors." °.

That case arose out of a proceeding in insolvency under the laws of the state of Massachusetts. Shaw and Gardner were, prior to the institution of the proceeding, conducting business as copartners. Shaw sold his interest. The question, as stated by the judge, was:

"Whether, notwithstanding the sale and transfer by one partner to the other, the property is still to be regarded as joint estate, and to be applied to the payment of the debts of the partnership accordingly."

The court found nothing in the evidence to show an intention, in making the sale, to defraud the partnership creditors, saying:

"The subsequent conduct of Gardner is strongly confirmatory of the good faith of the transaction. He continued to carry on the business, formerly conducted by the firm, and notified the creditors by letter of the dissolution, and that the business would be continued by himself. While he so carried on business on his sole account, he made considerable additions to the stock on his own credit, amounting to $500 or $600. Nor is there any positive evidence that either of the copartners, at the time of the dissolution, knew or believed that the copartnership would not be able to pay its debts in full, although in fact it subsequently turned out to have been at the time insolvent. Even if it were insolvent, within the knowledge of the partners, at the time of the dissolution and the transfer of the property, it is by no means certain that the transaction would then be fraudulent."

The cases cited in the note (54 Am. Dec. 73) fully sustain the proposition that, when one or two partners retires from business, relinquishing to the other all his interest in the partnership property, the remaining partner has the same dominion over it as if it had always been his own separate property. The doctrine appears to have its foundation upon the decision of Lord Eldon in Ex parte Ruffin, 6 Vesey, 127.

The principle involved here is illustrated in the case of Sargent v. Blake, 160 Fed. 57, 87 C. C. A. 213, 17 L. R. A. (N. S.) 1040, 15 Ann. Cas. 58. There King and Maxwell formed a partnership. Maxwell borrowed money from his mother to put into the business, giving her his promissory note. Some trouble arising between the partners, by reason of King having drawn out all of the money he had put in the business, except a small amount, King sold his interest in the business and property to Maxwell and executed to him a bill of sale therefor. Both partners were insolvent, but each testified that they did not know of such insolvency. After receiving the bill of sale, Maxwell drew out of the bank sums of money formerly belonging to the company, which he paid to Mrs. Sargent in discharge of the note which she held against him. King testified that he did not consent to the use of the money for the payment to Mrs. Sargent of her note. It appeared that she did not know, nor have reasonable cause to believe, that the payment of her note gave her a preference over the other creditors of Maxwell or the company. Within four months after these transactions, the partnership and King and Maxwell individually were adjudged bankrupt. The trustee filed a bill in equity to recover from Mrs. Sargent the amounts paid her from the money which, before the purchase of King's interest in the property, belonged to the company. The right to recover was based upon two contentions—that the payment was made with intent on the part of Maxwell to hinder, defraud, and defeat the creditors, and that the money was, notwithstanding the bill of sale and purchase by Maxwell of King's interest in the property of the company, subject to the payment of the debts of the company, and that therefore its payment to Mrs. Sargent was unlawful. To this last contention Judge Sanborn says that this cause of action failed, because the payment was not made out of the funds of the partnership. The learned judge discusses the question from every viewpoint, and reaches the conclusion that the effect of the purchase by Maxwell of King's interest in the property of the partnership, prior to the proceeding in bankruptcy, vested the title to the property in him, as his separate estate, which he was entitled to use in the payment of his individual indebtedness, there being no fraudulent intent or purpose in the minds of the partners in the transaction. He says that until the partnership has been brought within the jurisdiction of the court for administration—

"each partner has the plenary power, at any time, to release or waive this right [to require the partnership property to be first applied to the partnership debts] and each partner has done so, and if, at the time the property comes within the jurisdiction of a court no partner has this right, then no creditor of the partnership has it, for a stream cannot rise higher than its source."

The discussion of the questions involved and citation of authorities by the learned judge are enlightening. It is true that many well-considered and well-sustained decisions hold that if a firm is insolvent, or on the eve of insolvency, and both partners are also insolvent, a purchase by one partner of the interest of the other in consideration of the former assumption of debts is upon a consideration which is of no value, no equivalent having been given, the transfer is in effect voluntary, and its only effect, if sustained, would be to hinder partnership creditors, and hence deemed ineffectual to convert the joint property as against the creditors. Bates on Partnership, 584. However that may be, and whatever a decision of a court of equity may have been upon a bill to declare the purchase by Baker from Selma K. Edwards void as against partnership creditors, the question is not, in this proceeding, presented.

The referee finds, and the evidence supports his conclusion, that Mrs. Edwards loaned to her husband, at the time the partnership was formed, $2,000; that he paid $1,500 of this amount into the partnership business, and loaned his copartner the remaining $500, which he put into the business. It appears that, on September 9, 1914, the stock of goods and accounts inventoried $11,550, and the indebtedness, exclusive of the amount due Mrs. Edwards, was $6,000. It cannot be said that, at the time Mrs. Edwards purchased her husband's one-half interest in the property of the firm, it was of no value. It is found that he owed her $1,500, the release of which constituted a valuable consideration. This sale worked a dissolution of the firm. She then owned a valuable, or what evidently all parties then thought to be a valuable, interest in the property. Within a few days she sold this interest to Baker for $1,500, taking his notes running until January 1, 1917, for the purchase price. He at once gave notice, in the usual way, to the public and to persons with whom the firm had been dealing, that he had purchased his partner's interest and would continue the business along the same lines as theretofore. The transaction bears upon its face every indication of good faith and honesty. While on January 29, 1915, he filed a petition in bankruptcy, it is not an unreasonable assumption that on September 24, 1914, he regarded the business as solvent. It it known of all men, now, as world history made during the past nine months, that on account of conditions which wrought financial disaster to those who produced, and those whose business was dependent upon the production of, cotton, as in this section of North Carolina, thousands of men, who on September 1, 1914, regarded themselves as solvent, found themselves, on January 1, 1915, unable to meet their financial obligations.

Viewed in the light of conditions well known, and courts must take account of such conditions, or they will do injustice and work ruin to many honest people, Baker may well have regarded his purchase from Mrs. Edwards as a fair business transaction. It must be kept in mind that the purchase by Baker of the interest in the business and its property made no change in the legal liability of Edwards or himself to the partnership creditors. They continued liable individually, nor did the transaction wihdraw the partnership property from legal

process for the recovery of the debts of the partnership. Edwards and himself could have sold the partnership property, and with the proceeds paid their individual debts, or made any other disposition of them, which was not fraudulent as to their creditors. As we have seen, the partnership creditors had no lien on the property. At the date of filing the petition in bankruptcy by Baker, he was the sole owner of the property formerly belonging to the partnership prior to its dissolution.

[3] The form of the petition is peculiar. Section 5 of the Bankruptcy Act (Comp. St. 1913, § 9589) provides that a partnership, during the continuance of the partnership business, or after its dissolution, and before the final settlement thereof, may be adjudged a bankrupt. The act makes provision for the adjudication of the individual members of the partnership and the manner of administration and distribution of the assets. Questions which have engaged the attention of the courts, arising out of what is termed the "partnership entity doctrine" and the provisions of the act regarding the administration of partnership assets, are not presented here, because there were no partnership assets at the time of filing the petition. While the petition is filed by "Baker & Edwards, by W. C. Baker," it would seem that, as the firm of Baker & Edwards had been dissolved and its entire property transferred to W. C. Baker, the proceeding should be regarded as having been instituted by W. C. Baker, doing business as Baker & Edwards. This is the real status of the petitioner and his business. Thus understood, the method of administration of the assets among his creditors becomes very clear and simple. L. E. Edwards has no interest in the manner of, or order in which, the assets are applied. He parted with his interest by the sale to his wife, Selma K. Edwards, September 9, 1914. Edwards, not being a party to the petition in bankruptcy, and not having elected to come in and join Baker therein, if the partnership still existed, or if dissolved and no final settlement made, could, under the provisions of section 5h, have settled the partnership affairs and administered its assets himself. Having sold his interest in the partnership property, he had no such right thereafter.

The ruling of the referee in regard to the right of Selma K. Edwards to prove her claims of $500 and $1,500 against the bankrupt, W. C. Baker, and share in the distribution of the assets in the hands of the trustee, is affirmed.